**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

CHERYL A. HICOK,

           Plaintiff,

vs.

JOANNE B. BARNHART,
Commissioner of Social Security,

           Defendant.

No. C05-3009-MWB

**REPORT AND RECOMMENDATION**

---

### *TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

    *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
         *1.*    *Introductory facts and Hicok's hearing testimony* . . . . . . . . . **3**
         *2.*    *Duane Hicok's hearing testimony* . . . . . . . . . . . . . . . . . . . . **7**
         *3.*    *Hicok's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
             *a.*    *Knee problems* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
             *b.*    *Shoulder and neck pain* . . . . . . . . . . . . . . . . . . . . . **12**
             *c.*    *Arm and hand problems* . . . . . . . . . . . . . . . . . . . . . **19**
             *d.*    *Body as a whole* . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
         *4.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . . **30**
         *5.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

III.  **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND**
     **THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **35**

    *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . . **35**
    *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . . **37**

IV.  **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

V.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**

# I. INTRODUCTION

The plaintiff Billi Jo Hicok ("Hicok") appeals a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Hicok claims the ALJ erred in rejecting the opinions of her treating physician and her vocational counselors regarding her functional capacity and her ability to sustain competitive employment. (*See* Doc. No. 8)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On May 6, 2002, Hicok protectively filed applications for DI and SSI benefits, alleging a disability onset date of January 7, 2002. (R. 107-10; *see* R. 7) Hicok alleged she was disabled due to osteoarthritis of both knees, and carpal tunnel syndrome in both hands. She alleged her condition limited her ability to walk, climb, stand, sit for prolonged periods, and use her hands. (R. 138) She claimed she began having "a lot of problems after or about the time [she] got laid off from [her] job from down sizing," which occurred on January 7, 2002. (*Id.*) Her applications were denied initially and on reconsideration. (R. 91-97, 100-03; *see* R. 7)

Hicok requested a hearing (R. 105), and a hearing was held before ALJ Denzel R. Busick on July 20, 2004, in Des Moines, Iowa. (R. 50-90) Hicok was represented at the hearing by attorney Jackie Armstrong. Hicok testified at the hearing, as did her husband Duane Hicok. Vocational Expert ("VE") Elizabeth Albrecht also testified at the hearing.

On September 22, 2004, the ALJ ruled Hicok was not entitled to benefits. (R. 18-30) Hicok appealed the ALJ's ruling, and on January 13, 2005, the Appeals Council denied Hicok's request for review (R. 9-13), making the ALJ's decision the final decision of the Commissioner.

Hicok filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated

September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Hicok's claim. Hicok filed a brief supporting her claim on June 28, 2005. (Doc. No. 8) The Commissioner filed a responsive brief on August 4, 2005 (Doc. No. 9) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Hicok's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Hicok's hearing testimony

At the time of the hearing, Hicok was forty-eight years old. She weighed 171 pounds and was 5'1½" tall. She was living in a one-level house in Mason City, Iowa, with her husband and two stepchildren. (R. 54-55)

Hicok graduated from high school, and she stated she has reasonably good basic math and English skills. She last worked at Alexander Technology, a company that "built cups and adapters for batteries." (R. 55) Hicok worked as a production associate, running a soldering iron, drill press, milling machine, rivet machine, crimp machine, and other tasks required to fill orders that came into the company. The job required her to lift up to thirty or forty pounds on occasion. She worked at the company from July 1991 until she was laid off in January 2002, and she has not returned to any type of employment since that time. (R. 55-56) Hicok stated she was up and down all day during her job, and she was able to change positions at will. She had regular breaks during the day. According to Hicok, all of her work reviews were positive. (R. 68-69) Her attorney noted that a poor review had been provided to the state disability agency (*see* R. 217-18), but Hicok stated the person who completed the report was never her direct supervisor and had never

given her a review during her employment. She stated she worked in a different area of the plant than the person who had completed the report.[1] (R. 69)

Prior to working at Alexander Technology, Hicok ran a daycare business in her home from 1985 to 1991. In addition, at some point within the last fifteen years, Hicok worked briefly at a school cafeteria, where she served food, wiped down tables, and washed dishes. (R. 56-57, 74)

Hicok stated that since January 2002, she has been experiencing "a lot of problems with muscle and joint," including generalized stiffness and soreness throughout her body and tingling in her hands and fingers. (R. 57-58) She opined she can stand for fifteen to twenty minutes at a time if she exercises her legs while she is standing. She walks on a treadmill in her home several times a day, for ten to fifteen minutes at a time. She can sit in a straight-backed chair for ten to fifteen minutes before she begins to get stiff. She does not lift anything heavier than a gallon of milk. She has limited ability to bend forward and backward at the waist, and has difficulty bending her knees to crouch down. She can reach with her arms out in front and to the sides, but she has problems reaching over her head. She cannot crawl on her hands and knees without experiencing a lot of pain and pressure. If she gets down on one or both knees and tries to get back up, she will "tip usually to the side." According to Hicok, she has arthritis in her knees, and kneeling causes her a lot of pain in the center of her knees. (R. 57-59)

Hicok stated when she goes up and down stairs, she takes the stairs one a time and holds onto the railing. She stated she has not tried to hold onto items like a soldering gun with a trigger since she stopped working, but she opined she would be unable to hammer a dozen nails because "it would affect the muscles in [her] shoulders and [her] hands." (R. 60) She can use a pair of pliers, but is unsure whether she could grip a tool tightly.

[1]The court notes the work review in question was only "poor" to the extent it references frequent absences and an inability to concentrate and remain on task. The reviewer noted Hicok had frequent absences due to medical problems, she "[n]ever had a day when she felt good," and she complained to her supervisors and others frequently. (*See* R. 217-18)

She can use a needle and thread for "[a] very short sewing job," like sewing on a button or mending a small hole. (*Id.*) She can type on a computer for a short period of time. She drives an automobile with an automatic transmission. She can see well with corrective lenses, but she sometimes has problems with hearing. (R. 60-61) She is able to dress and bathe herself without assistance. (R. 71)

Hicok stated she usually takes one of her stepchildren or a friend with her to the grocery store to help lift items into the cart. She is able to do some dusting around the house, but she stated if she does repetitive work, her shoulders will hurt, so she only does a little bit at a time. Her stepchildren do the vacuuming most of the time. If she needs to sweep or mop the floor, she will "sit on the floor and mop it that way." (R. 62) She and her husband share cooking chores, and she usually has someone else lift anything that has to come out of the oven. She does no outside yard work or gardening. (*Id.*)

Hicok listed her current medications as Premarin (an estrogen supplement), Ditropan (a treatment for overactive bladder), Propoxyphene (a pain reliever), Flexeril (a muscle relaxant), Toprol XL (a hypotensive agent), Wellbutrin (an antidepressant), Accupril (a hypotensive agent), and HCTZ (hydrochlorothiazide, a diuretic).[2] (R. 62-63, 238) She stated the Propoxyphene and Flexeril make her tired. She estimated she gets four to five hours of uninterrupted sleep at night, but pain in her back or shoulders will wake her up. She tries not to nap during the day "because that tends to work more against [her]." (R. 63)

Hicok stated that during the day, she babysits her four-year-old grandson. She stated her grandson is "real helpful," and will get things from the refrigerator or out of the garage for her. (*Id.*) She makes her grandson's lunch, but otherwise he "takes care of himself." (R. 71) Hicok's stepchildren, who are teenagers, also help care for her grandson, such as taking him to the playground. (*Id.*) Hicok stated her children are very

---

[2] Drug descriptions are from www.rxlist.com (12/02/05).

5

active on the weekends, but she and her husband usually stay at home. She has limited some of her activities due to pain and fatigue, such as attending her kids' softball games and going out to movies or other activities. (R. 71)

Hicok stated she began having muscle problems prior to being laid off from work in January 2002. She apparently had carpal tunnel surgery on her right hand at some point, but according to her, her doctor told her she "had more going on than . . . carpal tunnel." (R. 64) After she was laid off, her muscle and joint pain increased. According to Hicok, her doctors ordered x-rays that showed she had increasing arthritis and osteoarthritis in her knees, and they recommended she limit the time she spends on her feet and sitting. She stated that in August 2002, a doctor diagnosed her with fibromyalgia. (R. 64-65) Hicok stated her inability to work began in August 2002. (R. 64)

After she was laid off from her job in January 2002, Hicok drew unemployment benefits until August 2002, when, according to her, her doctor stated she was no longer capable of working forty hours a week, which disqualified her from continuing to collect unemployment benefits. She stated she has continued to look for work, and even sought the assistance of a professional vocational rehabilitation specialist who assisted her in trying to find a job. (R. 64-66) She tried to work at one job, which she described as "taking pots from Rivermill, putting the holes together and sewing them holes shut," but she was unable to do the fine manipulation required for the job, and the "looking down . . . affected [her] neck and shoulder area." (R. 66) She only worked for two-and-a-half hours before she was stiff and sore. She went home and used ice to help relieve the pain and stiffness. (*Id.*)

Hicok stated she uses the therapy pool and whirlpool at the YMCA, which helps relieve her pain. At home, she usually sits in a recliner with her feet elevated. She estimates she spends about four hours a day in the recliner. (R. 66-67) She stated before "all this set in," she used to walk three to six miles a day, go roller blading and roller skating, and do other activities. She no longer is able to do those things due to pain. She

stated walking on her treadmill is easier than walking on pavement. She stated her doctor has advised her to elevate her feet, and he prescribed a cane for her in 2002. (R. 67)

Hicok testified she has pain every day. On a particularly bad day, she can stand for only short periods of time, and she spends most of the day in the recliner or laying down to keep weight off of her joints and muscles. If she stands too long, she feels like she has "swelling [and] the skin gets real tight." (R. 70) She estimated she has a really bad day at least two or three days a week. (*Id.*)

Hicok stated she has had several functional capacity evaluations. According to Hicok, her condition was markedly worse when she saw Jon R. Yankey, M.D. in September 2002, than it had been at the time of her first evaluation in November 2000. Hicok stated Dr. Yankey pushed her to see how far she could bend her legs and the like, and when she left the evaluation, she was crying and "went right straight to the Y to get in the therapy pool because [she] hurt so bad." (R. 72)

Hicok stated she receives treatment for her back pain that includes ultrasound heat and massage. (R. 83)

## 2. *Duane Hicok's hearing testimony*

Duane Hicok ("Duane") is Hicok's husband, and they had been married for about ten years at the time of the hearing. Duane stated Hicok "used to be very active," engaging in roller blading, roller skating, walking, and going to parks frequently. He stated Hicok is no longer able to do those activities. He stated that on a typical weekend, he and Hicok spend most of their time sitting around watching television. He goes for walks by himself, but misses having Hicok with him. He noted they have friends with a boat, and Hicok is no longer able to go out on the boat. (R. 84) According to Duane, Hicok sometimes tries to attend some of the kids' basketball games, but she "normally will sit at the very end of the bleachers so she has room to get up and battle it and [is] not in anybody's way[.]" (R. 85) However, he stated they seldom go to ball games anymore

because it takes them four hours to drive from Mason City to Des Moines for the games due to Hicok's bladder problems, and her need to "stop at every rest stop, every gas station that [they] can find along the way." (R. 85-86) He stated they have to stop about every half hour. (R. 86)

Duane stated when he is home from work and can observe Hicok, she spends most of her time sitting in the recliner. She gets on the treadmill occasionally. He and the kids do a lot of the housework to help Hicok. He noted Hicok rolls and moves around a lot at night while she is sleeping. (R. 85)

### 3. Hicok's medical history

#### a. Knee problems

On January 19, 1999, Hicok was seen in the Mason City Clinic for follow-up after arthroscopic knee surgery to repair an injury she sustained during a fall. She exhibited full range of motion, had "nearly symmetric quadriceps strength, and her incisions had healed well. She was released to return to work without restrictions. (R. 280, 283)

On January 25, 2000, Hicok called the Mason City Clinic complaining of increasing pain and swelling of her right knee with no apparent injury or other cause. She was seen by Christopher E. Scott, M.D. on February 7, 2000. X-rays showed "some slight increased narrowing of the medial joint space which was mild," and Dr. Scott's assessment was "[r]ight knee degenerative joint disease (DJD), mild." (R. 351) He offered Hicok a cortisone injection, which she declined. He prescribed regular anti-inflammatory medications, regular activity, and keeping her weight down. (*Id.*)

Hicok injured her knee in September 2000, "when she caught her foot on a strap at home," and then "stepped incorrectly" the next day. (R. 283) X-rays were negative, and doctors diagnosed a possible lateral meniscus tear. (R. 345) She was treated with a variety of therapies and showed good improvement of her right knee one month later. (R. 281) At a follow-up visit on October 16, 2000, Hicok reported her knee was

improving, and she was back to walking three miles daily. However, she noted she had shoulder pain that had not improved. (R. 343)

On December 18, 2000, Hicok saw Darron M. Jones, M.D. for follow-up of her right knee pain. She reported changed symptoms, noting her knee swelled and was bothersome after activity. She exhibited full range of motion, some crepitus, and some tenderness on examination. She was encouraged to do quadriceps strengthening exercises, but was given "[n]o other restrictions." (R. 335)

Hicok saw a physician's assistant at Mason City Clinic on February 6, 2001, complaining of increased pain in her right knee. She reported stepping down hard off of a step, jarring her knee and causing some swelling. A night brace was providing her with some relief. (R. 412) Because Hicok had responded well to physical therapy previously, the P.A. opined "she would benefit from hamstring and iliotibial band stretching and ultrasound or phonophoresis." (R. 413) Hicok received samples of Vioxx, and a prescription for physical therapy. (*Id.*)

On February 14, 2001, Hicok was seen at Mercy Medical Center Rehabilitation Services with complaints of pain "on the outside of the right knee above the knee joint and on the medial side of the knee cap with activity such as going up and down stairs and walking over a prolonged period of time." (R. 362) Darron Jones, M.D. had referred Hicok for range of motion and strengthening exercises, as well as pain-relieving modalities. She received ultrasound and exercise treatments, and was given instructions for a home exercise program. She was scheduled to return two to three times weekly for additional therapy. (*Id.*)

Hicok saw a physician's assistant on February 21, 2001, complaining of pain in her knee. She was advised to continue with physical therapy and Vioxx. (R. 409)

Hicok was discharged from physical therapy on April 14, 2001. She reported "feeling much better" and was walking "five to six miles a day without any increase in

discomfort." (R. 370) She was released to "[r]eturn to functional activities at home and at work without any limitation of knee motion." (*Id.*)

On December 2, 2001, an x-ray of Hicok's left knee showed "[t]ricompartmental osteoarthritis with accompanying joint effusion." The radiologist recommended an MRI study for further evaluation. (R. 381)

On December 3, 2001, Hicok saw Christopher E. Scott, M.D., complaining of pain and swelling in her left knee. She stated she had been to the emergency room three days earlier, and they had taken some x-rays of her knee and placed her on crutches. She stated the crutches had not helped much, and she continued to have pain with ambulation and a stiff, full feeling in her knee. Dr. Scott reviewed the ER x-rays, which were "unremarkable except for effusion." (R. 384) He suggested aspiration and injection but Hicok declined the procedure and elected to wait and see if her knee would calm down. (R. 385) On December 6, 2001, Hicok requested a prescription for Naproxen. Dr. Scott agreed she could have the prescription, but suggested she just take over-the-counter Aleve. (R. 383)

Hicok saw Dr. Scott on January 3, 2002, for follow-up of her knee problems. She complained of swelling, aching, and soreness in both knees, and she stated it was difficult for her to get out of a chair. Dr. Scott opined that Hicok had "early osteoarthritis of both knees." (R. 506) He injected her left knee with Marcaine, Lidocaine, and Depo Medrol, and directed her to return for follow-up in two weeks. (*Id.*) Hicok returned to the office the next day reporting that she had been up running errands all day, her knee had not been elevated, and it was swollen. She was directed to go home and elevate her knee above the heart level, use ice, and take Extra-Strength Tylenol during the day and Tylenol with Codeine at night. (R. 505)

Hicok called the Mercy Internal Medicine Clinic on January 9, 2002, to report that she had been laid off from her job, and to request an appointment. (R. 483) She saw Dr. Scott on January 14, 2002. She reported some improvement in her knee following the

injection, and stated she was walking up to a mile a day. (R. 504) At her next visit, on January 25, 2002, however, she reported increased discomfort in both knees. Dr. Scott opined Hicok showed signs of "[l]eft knee early degenerative joint disease (DJD)." He recommended she see R. Bruce Trimble, M.D. for medical management of her symptoms. (R. 503)

Hicok saw Dr. Trimble on February 15, 2002, for a consultation at the request of Dr. Scott, "for osteoarthritis of knees in an attempt to find medication which would be more helpful than what she has been on." (R. 480) Dr. Trimble diagnosed Hicok with osteoarthritis, "probably a little worse than appears on x-ray." (R. 481) He emphasized the importance of weight reduction and scheduled an appointment for Hicok with a dietitian. He encouraged Hicok to be active and exercise. He prescribed Sulindac, with an alternate of Salsalate if the Sulindac raised her blood pressure. He also recommended she take Glucosamine. He noted Hicok had "no evidence of true inflammatory arthritis," and he opined she was too young for any type of extensive surgery. (*Id.*)

Dr. Trimble completed a "Doctor's Statement of Disability" form on March 2, 2002, in which he stated Hicok had been diagnosed with osteoarthritis of both knees. He stated Hicok's functional limitations included limited walking, climbing, time on her feet, and prolonged sitting. He opined Hicok would need knee replacement surgery in five to ten years. (R. 489)

Hicok saw Steven H. Septer, M.D. on March 11, 2002, for follow-up regarding her knee pain. Notes indicate x-rays showed degenerative changes. Hicok complained of "severe aching in the knees that she describe[d] as 6 or 7 out of 10 in intensity, . . . worse with weightbearing, better at rest." (R. 479) Dr. Septer advised Hicok to "watch her diet more carefully and try to do more exercising." (*Id.*) Hicok returned to see Dr. Septer on May 20, 2002. He noted Hicok's knees showed "tenderness along the medial and lateral joint lines of the knees bilaterally," with no effusion or arythema. She also had limited range of motion of her knees bilaterally, and her knees were slightly warm to the touch.

(R. 473)  The doctor planned to review orthopaedic information regarding a possible disability rating for Hicok's knees.  He noted Hicok had "known degenerative arthritis of the knees bilaterally on x-ray."  (*Id.*)

On May 29, 2002, Dr. Septer wrote a note in which he stated Hicok was under his medical care and had "a permanent disability."  (R. 488)

On July 31, 2002, Dr. Septer wrote Hicok a prescription for physical therapy for her knee problems.  (R. 487)  He again prescribed physical therapy on October 17, 2002. (R. 486)

### b.    *Shoulder and neck pain*

On January 25, 2000, Hicok was evaluated following "fairly quick onset of pain near her right upper trapezius, lateral elbow and forearm, as well as all five fingers of her right upper extremity."  (R. 303)  She was diagnosed with "[r]ight arm overuse syndrome," and was treated with ultrasound, cervical retraction and mobilization, which provided her with some immediate relief.  (*Id.*)  She continued with physical therapy three times weekly from January 25, 2000, to April 6, 2000.  Although she "made progress with decreased upper extremity symptoms overall," she continued to exhibit symptoms in her shoulder and neck.  Additional physical therapy was prescribed.  (R. 302)

Hicok finished her physical therapy on April 28, 2000.  On July 12, 2000, she returned to the doctor, complaining that her symptoms had worsened.  She complained of "a tingling sensation throughout her right upper extremity and hand," as well as "pain in her right shoulder and upper trapezius, and base of her right neck," together with frequent headaches.  (R. 300)  Hicok stated her symptoms "increased with arm activity including pushing, pulling, and gripping," and she could not sleep on her right shoulder.  (*Id.*) According to Hicok, an MRI of her neck had revealed "multiple cervical disc bulges." (*Id.*)  Hicok was treated with ultrasound and soft tissue mobilization.  She was scheduled

for three weeks of physical therapy, three visits per week. (R. 301) She underwent a full evaluation on July 15, 2000, which resulted in the following assessment of her condition:

1. Muscle imbalance of the chest wall versus the upper back.
2. Secondary impingement due to forward shoulder position causing early impingement with shoulder motion.
3. Irritable upper trapezius as a primary or secondary result of posture increasing muscle tension length.
4. Forward shoulder.
5. Signs of neurological irritation typical of pseudothoracic outlet syndrome or nerve irritation through scalene triangle.

(R. 298)

Hicok underwent an x-ray and an arthrographic study of her right shoulder on August 8, 2000. The studies showed "some sclerosis involving the greater tuberosity"; "inferiorly located osteophytes . . . at the acromioclavicular articulation"; and "no evidence of a full thickness tear," so an MRI was ordered. The MRI study showed a small partial tear along the undersurface of the supraspinatus tendon; "[d]egenerative changes at the acromioclavicular articulation with resultant mass effect on the supraspinatus tendon/ muscle junction"; and a small amount of fluid within the subacromial/subdeltoid bursa, which the radiologist opined was reflective of "either prior injection or underlying bursitis." (R. 285-87)

On August 10, 2000, Hicok saw Michael W. Crane, M.D. for evaluation of her right shoulder in connection with a worker's compensation claim. Hicok reported going to the emergency room the previous evening because she was in a lot of pain. She reported that most of her pain was in her shoulder, and noted she had also had carpal tunnel symptoms and tennis elbow symptoms. Dr. Crane noted Hicok's arthrogram was negative. He interpreted the MRI of Hicok's shoulder to "show some possible supraspinatus findings, but she also ha[d] some degenerative changes in the acromioclavicular joint with . . . an inferior spur situation off the clavicle which could be associated with an impingement syndrome." (R. 350) The doctor directed Hicok to

remain off work until at least August 14, 2000, and then to return in a "somewhat limited" capacity. (*Id.*) On August 24, 2000, Dr. Crane saw Hicok for follow-up. He noted her pain was somewhat improved and she had "fairly good range of motion." Hicok's x-rays showed "AC joint arthritis with some inferior spurring." (R. 348) He injected Hicok's shoulder with Aristospan mixed with Marcaine, and directed her to return for follow-up in three to four weeks. (R. 349-50)

On August 30, 2000, Hicok called to report the cortisone injection had not helped, and she actually had experienced increased pain for two to three days. She was advised to "give it a little more time," and to use ice several times a day. (R. 347)

Hicok returned for recheck of her shoulder on September 14, 2000. She was still experiencing pain and stated the shot had not helped at all. Her most intense pain was in the trapezius muscle. Dr. Crane opined surgery would not help Hicok's pain. He noted Hicok would "need significant time off work not using the shoulder, probably about a month," and he prescribed physical therapy. He ordered Hicok not to perform any work other than "paperwork." (R. 346)

As of October 13, 2000, Hicok continued to exhibit "muscle imbalance of the chest wall and posterior scapular area." (R. 296) She had shown "significant improvement in cervical and shoulder range of motion," but she continued to have pain. Michael W. Crane, M.D. noted Hicok had difficulty separating her pain into levels, describing her pain as "all or none." (R. 297) The physical therapist opined the chronic nature of Hicok's pain caused her to be "focused on pain and not on function at this time." (R. 296) Hicok was scheduled for further physical therapy at a reduced frequency "to see if tissue calms and improves with less frequent aggressive treatment." (R. 297)

On October 19, 2000, Hicok saw Dr. Crane for follow-up. She reported her shoulder pain was improving, and she exhibited "better range of motion and strength." (R. 342) According to Hicok, she had been told not to return to work unless she had a full

work release from her doctor. Dr. Crane did not change Hicok's work restrictions, noting he wanted a functional abilities profile first. (*Id.*)

Hicook returned to see Dr. Crane on November 9, 2000. He had reviewed her functional ability profile results, and he had performed a work center analysis. He gave Hicok final work restrictions to take to her employer. In his examination, Dr. Crane noted the following:

> On examination today, interestingly, when [Hicok] got up, I placed my hand very, very lightly touching the right shoulder. She went down, had a lot of pain, and really out of proportion to the touch, although she had a lot of reaction to anything I had her do with the shoulder. Actually, some of the things that I had her do did not cause quite as much of a problem. In fact, her range of motion is fairly near to normal in full extension and abduction. Internal rotation goes to about 70 degrees. External rotation goes to about 80 degrees.

(R. 341) Dr. Crane noted Hicok's subjective complaints did not align with his objective findings. He advised Hicok "that if she cannot handle work, she is going to have to reach that decision." (*Id.*) He noted she was starting back to work for four hours at a time. (*Id.*)

On November 21, 2000, Hicok called to report that while working four hours per day, her shoulder was becoming very painful and she had some swelling in the shoulder. She was continuing to see the physical therapist, but reported it was becoming very painful, and the therapist could not do soft tissue therapy because she was sore to the touch. Hicok was advised to "continue work as tolerated," and perhaps talk with her employer to see if there were accommodations that could be made for her. Dr. Crane had no other therapy to offer her. (R. 340) Hicok stopped by Dr. Crane's office on November 27, 2000, and a physician's assistant looked at her shoulder. He could appreciate only a little bit of swelling on the proximal end of the clavicle, but noted Hicok was very tender to touch. He directed Hicok to continue working until she saw Dr. Crane again. (R. 339)

On November 27, 2000, Dr. Crane and the physical therapist evaluated Hicok's overall progress and determined she was unable to advance further "due to poor tolerance to increasing activity levels." (R. 295) Her treatment history was summarized as follows:

> The patient initially was reassessed at the Work Center on October 13, 2000, after a previous series of treatment at the Work Center. The patient has hypersensitivity to the right anterior and superior shoulder region which limits any treatment and physical therapy aimed at reduction of pain and increasing muscular extensibility for increased range of motion and strength. The patient remains very guarded in her movement and hypersensitive to touch with even light stroking of the skin. There appears to be some possible soft tissue swelling in the right supraclavicular region as compared to the left. Ice and E-stem have only provided temporary relief and soft tissue mobilization and passive stretch are limited due to patient guarding.

(R. 294) The physical therapist planned to release Hicok from his care with a functional capacity evaluation. He noted they had "performed a job site analysis . . . to identify safe work restrictions at her current level." (R. 295; *see* R. 288-91)

The job site analysis indicated "a high level of variability" in Hicok's work demands. (R. 291) Some of her tasks required prolonged forward positioning and extension of her arms for small, fine hand movements, while other tasks required repeated reaching above shoulder and head level. (*Id.*) The analysis indicated Hicok's symptoms and pain complaints were consistent with her work activities. It was recommended that she work no longer than one hour at any particular work station; "eliminate job activities that require over shoulder level, reaching, pulling on a repeated basis"; and use adaptive eyewear that would allow her to sit upright to work, instead of bending forward. (*Id.*) The evaluator opined Hicok should never crawl; occasionally could squat, and do work at shoulder level and overhead; frequently could bend, twist, and perform fine hand movements; continuously could operate foot controls; and had no restrictions on her ability to stand, sit, walk, or climb stairs. (R. 292)

Hicok was seen for a functional capacity evaluation on November 29, 2000. She expressed "frustration with continued pain in the right upper extremity and neck." (R. 327) The physical therapist indicated Hicok's limitations were "pain-related at this time as there appeared to be an intact shoulder with no clear dysfunction." (*Id.*) After performing range-of-motion and other testing, the physical therapist opined Hicok should never crawl or kneel; occasionally could climb stairs, squat, do overhead work, and perform pinching and forceful gripping; frequently could work with her arms at shoulder level, and perform repetitive grasping and fine manipulation. He found no restrictions on Hicok's ability to stand, sit, walk, bend, twist, or operate foot controls. (R. 333; *see* R. 327-32)

Hicok returned to see Dr. Crane on December 12, 2000. Hicok expressed concern about swelling in her anterior neck area, and she complained of pain radiating over her shoulder and up into her neck. She noted she had been working eight-hour days and was "'doing everything' drill pressing and soldering." (R. 337) Upon examination, she exhibited full range of motion in her shoulder. Dr. Crane had no other treatment options to offer her. He opined no surgical procedure would benefit her, and advised her "to decide if she can tolerate working or not." (*Id.*) He further noted, "Once again, when I touch her to exam[ine] her, she reacts in a very impressive way." (*Id.*) Dr. Crane stated Hicok's functional capacity evaluation was appropriate and she "should continue with that." (*Id.*)

On December 14, 2000, Hicok called Dr. Crane's office to request that a note be faxed to her employer releasing her to work for eight hours per day with outlined restrictions. (R. 336)

Hicok called Dr. Crane's office on February 7, 2001, to request a clarification in her work release. The doctor faxed a release to Hicok's employer stating she could work four ten-hour days, rather than five eight-hour days. (R. 411)

Hicok apparently had an MRI of her right shoulder on August 8, 2001. Steven H. Septer, M.D. sent Hicok a copy of the MRI report, which revealed "abnormalities." In light of Hicok's ongoing pain, Dr. Septer recommended she obtain an orthopedic opinion regarding the MRI. (R. 446)

Hicok continued to see her doctors with generalized complaints of pain (*see* summary, *infra*), but the next time she saw a doctor specifically related only to her shoulder pain was May 9, 2002, when she saw Dr. Crane for follow-up of her right shoulder and arm pain. Dr. Crane noted Hicok was "walking incredibly slow for someone of her age," and she complained that "[e]verything hurts." (R. 497) She stated she had pain with any kind of movement, and her pain had gotten worse. Dr. Crane noted Hicok made "significant sound effects" with everything he asked her to do. He further noted that despite Hicok's complaints of pain, she could forward extend to 170 degrees, abduct to 160 degrees, back extend to 20 degrees, and had external rotation of 90 degrees and internal rotation of 80 degrees. Dr. Crane assessed Hicok's shoulder condition for disability purposes and gave her "a combined disability of 4% of the shoulder" as a permanent rating. (*Id.*)

Hicok saw Dr. Septer on October 10, 2002, complaining of pain in her right shoulder, particularly anteriorly, for three weeks, at a 7 out of 10 intensity. The pain was worse with movement and better at rest. The doctor ordered x-rays of her shoulder. (R. 453) The x-rays showed "degenerative arthritis with spur formation of glenohumeral and acromioclavicular joints." (R. 450, 511) At a follow-up visit with Dr. Septer on October 17, 2002, Hicok complained of increased shoulder pain and limited range of motion. Dr. Septer prescribed physical therapy with heat and ultrasound. (*Id.*) Hicok apparently attended physical therapy sessions for several weeks. (*See* R. 522-32, 542-45)

### c.     *Arm and hand problems*

Hicok saw Dr. Crane on February 1, 2001, complaining of "trouble with her right arm." (R. 414)  She complained of numbness and tingling in the little finger and ring finger, both at work and during the night, when it would awaken her.  She stated she was working at the factory four ten-hour days a week.  Upon examination, Hicok exhibited slightly decreased grip strength, intact range of motion, and tenderness over her ulnar nerve.  Her shoulder condition had not changed since her last visit.  Dr. Crane diagnosed probable ulnar neuropathy.  He prescribed a pad to keep her arm "from banging things," and told her to wear the pad twenty-four hours a day.  He also stated, "As far as work goes, she should work no overtime and wear the pad." (*Id.*)

Hicok called Dr. Crane's office on February 15, 2001, complaining of more problems with her right arm.  She reported having "continual numbness and tingling," and scheduled an appointment with Dr. Crane.  (R. 410)  Hicok saw Dr. Crane on February 22, 2001, complaining of a lot of pain and swelling in her right arm, down into her hand.  Dr. Crane ordered an EMG study, and diagnosed "some component of tardy ulnar neuritis." (R. 408)  He also called Hicok's employer and talked to the risk manager, after which the doctor made the following notes: "This lady has had a long history of a workman's compensation problem.  Every time I seem to be getting headway, she has a new problem.  Even today as I exam[ine] her arm, her reaction is more of a response than I would expect for a simple palpation or simple touching." (*Id.*)  The EMG study, done on March 1, 2001, was "consistent with moderate carpal tunnel syndrome on the right side," with no evidence of ulnar neuropathy.  (R. 406)  Hicok saw a neurology nurse on March 2, 2001, complaining of pain in her right shoulder and right thumb.  The nurse informed her that some pain and discomfort was normal at the site where the needle was inserted into the muscle.  She advised Hicok to watch for any signs of infection, and follow up as needed.  (R. 405)

Hicok saw Dr. Crane for follow-up on March 8, 2001. He advised Hicok to continue wearing an elbow pad and wrist splints. The doctor did not believe surgery would benefit Hicok, and he noted she would have to decide whether to continue working at her current position. (R. 404) Dr. Crane met with an insurance company representative on March 13, 2001, to discuss Hicok's condition. The doctor opined Hicok should be able to perform her current job, which required many different activities, no one of which exceeded Hicok's work restrictions. (R. 403) Dr. Crane entered a progress note on March 20, 2001, again opining that Hicok should be able to work at her current job. (R. 401-02)

Hicok was given some Vioxx samples on March 27, 2001. (R. 399) She saw Dr. Crane again on May 1, 2001, complaining of tenderness and soreness in her thumb from doing gripping exercises. Hicok stated she was wearing her splint twenty-four hours a day, seven days a week. Dr. Crane once again opined Hicok's job activities were not the cause of her problems, and she needed to make a decision as to whether to continue in her current job. (R. 398) On June 14, 2001, Hicok requested a work slip, but Dr. Crane stated her work restrictions had not changed. She continued to be released to work forty hours per week, in eight- or ten-hour days. (R 397)

Hicok saw Dr. Crane again on June 14, 2001. He noted she was still working at the same job. Because the numbness and tingling in Hicok's right hand had not improved with conservative care, the doctor recommended she undergo decompression of the carpal canal. However, he noted that although the procedure likely would relieve her symptoms, it was not likely to improve her work problems. (R. 396) On July 18, 2001, Hicok was still contemplating the carpal tunnel surgery. A physician's assistant recommended she try taking Vitamin B6 twice daily to see if that would help her symptoms. (R. 395)

On August 27, 2001, Hicok saw Christopher E. Scott, M.D. for a second opinion regarding her right carpal tunnel syndrome. Hicok expressed discomfort with Dr. Crane, and a desire to have someone else do her surgery. She complained of current problems

including night waking, numbness, and tingling in her hand and wrist; problems with driving and at work; chronic pain around her shoulder; and elbow pain for which she wore an elbow pad. Dr. Scott confirmed the diagnosis of right carpal tunnel syndrome, and discussed surgery with Hicok. (R. 393-94) Hicok called the doctor's office on September 21, 2001, to schedule her surgery. (R. 392)

Hicok underwent right carpal tunnel release surgery on November 1, 2001. (R. 369) She saw Dr. Scott for follow-up on November 5, 2001, and she reported "excellent relief of her painful preoperative paresthesia." (R. 389) Her stitches were removed on November 12, 2001, and she received a wrist splint and scar massage cream. She continued to report good relief of her painful paresthesia. (R. 387-88)

Hicok called the doctor's office on November 20, 2001, to report that she had resumed working the previous day, "at a one-handed job," and she began having pain in the evening. She reported some swelling in her fingers, as well. She was advised to be conscious of keeping her hand elevated at work, and to do flexion exercises. (R. 386)

At her next follow-up with Dr. Scott, on December 3, 2001, Hicok reported continued improvement of her right hand. She noted that working only with her left hand had aggravated the left hand a bit, but she was getting by. Her incision had healed well. She had diminished grip strength and a small amount of swelling. Dr. Scott liberalized Hicok's work restrictions to include lifting a few pounds with the right hand, and possibly soldering, if she could do that. She was advised to avoid repetitive activities with her right hand. (R. 384-85)

Hicok saw Dr. Scott again on December 17, 2001. She reported her scar was less tender but was still tender in places. Her paresthesia symptoms had resolved. She was tolerating her work with restrictions fairly well and was ready to do a little more. She continued massaging her scar and she was given another tube of scar massage cream, as well as a spring gripper to use for exercise. The doctor liberalized Hicok's work

restrictions to include lifting up to five pounds intermittently, and running a drill for a maximum of four hours a day. (R. 382)

At her next visit on January 14, 2002, Hicok reported continued discomfort at the base of her right palm. She also noted her left hand had increasing symptoms, which she attributed to greater use of her left hand to compensate for her right hand, both before and after surgery. Her strength and sensation were improved, and her wound was well healed. She reported that she had been laid off from her job permanently and had talked with the unemployment office. Dr. Scott directed her to continue increasing her activities as tolerated, perform gripping exercises, and "take the time to reincorporate her hand into regular activities of daily living." (R. 504) The doctor diagnosed "[s]igns and symptoms of left carpal tunnel syndrome." (*Id.*) On January 25, 2002, Hicok reported her hand was getting better slowly, and she exhibited good finger motion in the right hand. (R. 503)

On January 21, 2002, Dr. Scott completed a Vocational Rehabilitation form indicating Hicok carried diagnoses of "knee arthritis" and "carpal tunnel syndrome." He stated she would have limited use of her right hand, and she should continue her current medications and exercises. (R. 507)

Hicok saw Dr. Scott again on February 11, 2002. She reported increasing problems using her left hand. The doctor ordered an EMG, which confirmed Dr. Scott's preliminary diagnosis of moderate carpal tunnel syndrome on the left. (R. 501, 502) Dr. Scott reviewed the EMG findings with Hicok on March 11, 2002, and scheduled her for carpal tunnel decompression on the left. He noted, however, that because Hicok was no longer working, he would have to await preapproval before performing the surgery. (R. 500) Hicok had the surgery on April 9, 2002 (*see* R. 546), and at a follow-up visit on April 18, 2002, her sutures were removed and she was doing well. Her left hand numbness and tingling had resolved, and she reported only some mild soreness in her left thumb. (R. 499)

As of May 3, 2002, Hicok was still healing from the left carpal tunnel decompression. Dr. Scott opined "she would not be able to return to work yet with her left carpal tunnel," but she probably could return to work in a few weeks. (R. 498)

On May 17, 2002, Hicok returned to see Dr. Scott for a disability rating relating to her carpal tunnel syndrome on the right. She continued to complain of pain in her right hand, mostly in the thumb. She also complained of aching in her knees, and stated she was "not sure what she [could] do for work." (R. 495) Dr. Scott also noted Hicok had "a somewhat depressed affect." (*Id.*) He found she had reached maximal medical improvement regarding her right hand. He opined her "only restriction would be to do some lighter duty with the left hand," but stated "she could do a fair amount of work with it at this time." (*Id.*) He noted Hicok was currently unemployed, and she was unsure whether she would be getting another job. Dr. Scott found Hicok had no permanent partial impairment from her carpal tunnel release on the right. He noted they would evaluate her left carpal tunnel for disability purposes in October 2002. (R. 495-96)

X-rays of Hicok's left hand and right thumb were taken in May and June 2002. (R. 555, 556) The only finding of note was '[m]ild diffuse degenerative joint disease involving the right thumb[.]" (R. 556)

Hicok saw Dr. Scott on August 5, 2002, complaining of continued bilateral wrist pain and some tenderness of her scars. Dr. Scott opined Hicok had not reached maximal medical improvement yet with regard to her left carpal tunnel. He noted Dr. Septer had obtained x-rays of Hicok's hands "and noted some basilar thumb arthritis as we have suspected from our previous examination and discussions." (R. 492) The doctor indicated it was unclear whether Hicok's symptoms represented "a true arthritic complex or more of a fibromyalgia type syndrome." (*Id.*) He opined she might need further evaluation by Dr. Trimble if she continued to have multiple arthralgias. (*Id.*)

On October 18, 2002, Dr. Scott opined Hicok had reached maximal medical improvement with regard to her left carpal tunnel. He noted Hicok had been diagnosed

with fibromyalgia (*see* summary, *infra*), and she "continue[d] to have aching pain throughout her body," including pain in her wrists. (R. 491) Dr. Scott found Hicok to have a 3% upper extremity impairment with regard to her left hand. (R. 490)

On January 20, 2003, Hicok had x-rays of her left shoulder and left thumb. The films showed "[l]ikely mild degenerative change" of her left shoulder, and negative findings for her left thumb. (R. 558)

Hicok underwent another EMG study on February 6, 2003, to determine whether she had evidence of "recurrent carpal tunnel syndrome, involvement of the ulnar nerves, or cervical radiculopathy on the right side." (R. 557) The study showed "mild carpal tunnel syndrome on the right side." (*Id.*) She saw Dr. Trimble for further evaluation on February 25, 2003, and he noted the EMG findings did not indicate additional surgery would be appropriate. He further noted Hicok was "wearing a wrist support for slightly unclear reasons," and he discouraged its further use absent some evidence it was clearly helping symptoms that Hicok recognized were due to carpal tunnel. (R. 581)

### d.     *Body as a whole*

On August 19, 2002, Hicok saw Dr. Septer with complaints of diffuse arthralgias and myalgias. Upon examination, she exhibited shoulder tenderness, right greater than left, and tenderness bilaterally in her thumbs, wrists, and knees. The doctor noted Hicok had "a known history of degenerative arthritis of the knees, back, and thumbs with mild degenerative changes in the feet," and her symptoms had been increasing for a couple of months in other areas, including her hands and the muscles of her thighs, lower legs, and upper arms. (R. 461) Dr. Septer diagnosed Hicok with "[d]egenerative arthritis of the shoulders, thumbs, and knees" and "[p]ossible fibromyalgia." (*Id.*) He referred Hicok back to Dr. Trimble for further evaluation. (*Id.*)

Dr. Trimble saw Hicok on August 28, 2002, for consultation due to "somewhat worsening symptoms of fibromyalgia." (R. 460) Dr. Trimble noted he had seen Hicok

six months earlier "for mild osteoarthritis of the knees," and since that time, Hicok had experienced "more extensive and generalized discomfort." (R. 460) She reported using an exercise bicycle and a therapy pool regularly, which gave her some relief, and she recently had obtained an orthotic for her shoes due to foot discomfort. She complained of generalized soreness all over her body. Dr. Trimble noted Hicok's previous lab studies had shown "at least one mild elevation of aspartate amino transferase and alanine transaminase." (*Id.*) Dr. Trimble ordered further lab studies. He diagnosed Hicok with fibromyalgia and prescribed a trial of Ultracet. He also noted the following: "I note her basic intolerance of regular extensive physical work and limited activity she does around the house. I think at this point she probably is basically incapacitated from regular full-time work." (*Id.*)

Dr. Trimble saw Hicok again on September 10, 2002. She complained of continued musculoskeletal discomfort, and she also complained of a burning sensation in her feet. (X-rays taken on July 31, 2002, had shown osteophytes, a bunion, and other degenerative changes of Hicok's feet. *See* R. 512.) Dr. Trimble emphasized the importance of continuing regular activity. He recommended a trial of antidepressant medication for her symptoms. (R. 457) He also noted the following:

> Long discussion about her work situation. I think that as a practical point, she simply is not going to be able to work eight hours a day at a job which requires regular significant physical labor. I think she might well be able to work a shorter period of time in a job which allows her to move around, such as reception, clerical, or a sales job. I note that she is rather young and might potentially qualify for some additional training.

(R. 458) Dr. Trimble also noted symptoms of mitral valve prolapse. (R. 457-58)

Hicok saw Dr. Septer the same day, and he noted Hicok was considering Dr. Trimble's recommendation that she try antidepressant medications. (R. 459)

On September 11, 2002, Hicok underwent a disability examination by Jon R. Yankey, M.D. at the request of the Iowa Disability Determination Services Bureau. (R. 533-40)  Based on his examination, and on Hicok's report of her history and symptoms, Dr. Yankey opined Hicok would be "moderately restricted" for kneeling, crawling, lifting, carrying, standing, moving about, walking, sitting, stooping, climbing, traveling, and work environment, but she would have no significant restrictions for handling objects, seeing, hearing, and speaking.  (R. 536)

On September 26, 2002, Dr. Septer wrote an opinion letter in which he stated the following:

> [Hicok] has diffuse degenerative arthritis and fibromyalgia. Because of her medical condition she has needed to buy a van so that she can enter and exit without great pain and difficulty. She also has been told to purchase an exercise bike for home use, as well as a treadmill and membership to the YMCA so that she can use the therapy pool . . . on a regular basis.  All of these purchases have been with medical recommendation and approval.  They are needed because of her medical conditions.

(R. 455)  Dr. Septer also noted that at his recommendation, Hicok was taking the nonprescription drug Glucosamine twice daily for her arthritis.  (R. 454)

On October 29, 2002, John A. May, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form.  He opined Hicok would be able to lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for six hours in an eight-hour day; and push/pull without limitation.  He found Hicok should avoid constant power gripping and "over hand activity" (R. 516), but she otherwise had no limitations on her ability to work.  (R. 513-20)  Dr. May noted the following from his records review:

> The claimant has mild osteoarthritis, of the right shoulder, right thumb, knee's [sic] and feet.  She has restriction of motion of all these joints at near end of range secondary to pain.  She has some weakness of grips but has full range of

motion of the fingers. She has generalized tendernesses compatible with fibromyalgia but also has involvement of control points. She even has tenderness to touch of the skin. Although she complains of painful movement she remaines [sic] fairly active attending to personal needs, light house work and is able to ambulate without assistive devices. There are inconsistencies in the file which do partially erode the credibility of the claimant's allegations such as variability of grip strength noted between evaluators, tenderness and pain elicited by touching the skin, able to ride exercise bike five miles, attend church, attend school events and ride in a car but states she can only sit for a few minutes. It is also noted that she can flex her knees to 90 degrees when sitting but has pain with flexion on exam. She also complains of pain with writing however she writes copious notes. She has been limited by her treating source to lifting 10 pounds. The claimant's [activities of daily living] indicate she is lifting greater than this weight.

(R. 521)

Hicok saw Dr. Septer on February 25, 2003, for a recheck of her long-standing hyperlipidemia. The doctor noted Hicok had "diffuse generalized arthralgias and myalgias that are secondary to her fibromyalgia and degenerative arthritis," and she was "applying for disability." (R. 578) He also noted Hicok had "diffuse joint and muscle tenderness with some degenerative changes in the hands." (*Id.*) Dr. Septer planned to obtain a new functional capacity assessment of Hicok's work-related abilities. (R. 579)

Hicok also saw Dr. Trimble on February 25, 2003, on referral from Dr. Septer. Dr. Trimble noted Hicok had "full range of motion of all joints, although with some discomfort on movement of many of the joints." (R. 580) Her joints were not swollen, warm, or limited in motion. He noted she was "tender over most joints, essentially all the usual fibromyalgia tender areas but also most other areas of her body including most of the so-called fibromyalgia control points." (*Id.*) Dr. Trimble noted it was questionable whether to label Hicok's condition as fibromyalgia or "some other form of pain

syndrome," due to the generalized nature of her discomfort. (*Id.*) His recommendations were as follows:

> Discussed with her the fact that I had written to her attorney that I did not think I could support, from the history that I had and the dates that I understood them and declined that her symptoms were work related. I told her also that I would agree with the restrictions that Michael Crane, MD, had given in his letter. I think as a practical point she simply is unable to work full time. I am bothered about her degree of disability at her age and with a young family. I think we should pursue every avenue to try to help with this, including investigation of possible psychological factors. She is agreeable to referral to a psychiatrist and I will arrange an evaluation by Dale Armstrong, M.D. I would not add additional medications. I gently encouraged her to continue to try to be active in part of the world.

(R. 581)

Hicok underwent a Functional Capacity Evaluation by Dr. Septer, Dr. Bruce Harlan, and an occupational therapist, on March 7, 2003. (R. 559-67) Hicok stated the "entire testing procedure caused discomfort." (R. 565) She exhibited muscle tightness across her upper back, forearms, and upper arms. (*Id.*) The doctors' findings and assessment from the evaluation were as follows:

> POSITIVE FINDINGS
> 1. The patient's grips and pinch scores are weak.
> 2. Overall upper extremity strength is decreased.
> 3. Coordination times are slow.
> 4. All upper extremity motions cause pain. The patient reported pain 10/10 when she came in, and her pain became worse as the tests progressed.
>
> ASSESSMENT: The patient has severe limitations in use of the upper extremities. She is unable to squat to pick up items, and she is unable to do very much bending over to pick up items. Her walking is limited. She uses a quad-cane to assist with ambulation. The patient reports she is in a great deal of pain.

(R. 559) The doctors opined Hicok would be unable to lift from below the waist to the waist, or from shoulder to overhead; and she could lift only 3.75 pounds from waist to shoulder; stand occasionally for one to two minutes at a time; sit occasionally from five to ten minutes at a time; walk occasionally for short distances; climb one flight of stairs occasionally; and occasionally bend, operate foot controls, and perform fine manipulations. She frequently could perform grasping activities. She should never crawl, kneel, squat, perform overhead work, work with arms at shoulder level, or do forceful gripping, and she had weak pinching strength. (R. 566)

On March 21, 2003, at the request of Dr. Trimble, Hicok was evaluated by Dale A. Armstrong, M.D., a psychiatrist. Dr. Armstrong performed a full psychiatric evaluation and was unable to find any treatable psychological condition. He opined a trial of an antidepressant could benefit Hicok. (R. 569)

On May 29, 2003, Hicok saw Dr. Septer with complaints of low back pain over her lumbar spine, with no radiation, numbness, or tingling. (R. 575) An x-ray of Hicok's lumbosacral spine indicated "[m]ild panlumbar spine degenerative spondylosis with a little more prominent involvement occurring at L1-2." (R. 571, 606)

The record indicates Hicok continued to exhibit symptoms of fibromyalgia over the next year. She saw Dr. Septer for follow-up on April 7, 2004, "complaining of stiffness and joint pain . . . in multiple areas including her shoulders, elbows, wrists, and also into her right thumb but she also [had] bilateral hip, knee, and ankle pain." (R. 602) Her diagnosis continued to be fibromyalgia. (*Id.*) Dr. Septer opined Hicok's functional ability was markedly limited, and she would be able to tolerate only two to two-and-a-half hours of limited activity during an eight-hour work day. She would need to sit with her legs elevated for at least a portion of that time, and she could not "sit for more than an hour at a time without being able to move about in limited amounts because prolonged sitting [would] cause increasing stiffness and pain." (R. 583-84)

Hicok saw Dr. Septer again on June 28, 2004, complaining of pain in her lower back. The doctor noted Hicok had "known degenerative arthritis." (R. 604) He referred her to physical therapy for her back pain. (*Id.*)

### 4.    *Vocational expert's testimony*

VE Elizabeth Albrecht listed the following jobs as Hicok's past relevant work: (1) solder production line, light/medium, unskilled, with no acquired skills; (2) baby sitter, medium, semi-skilled; and (3) service attendant in school cafeteria, unskilled. (R. 74-75)

The ALJ asked the VE the following hypothetical question:

> Now if we assume we've got somebody who may be able to work at about a light level of work, light or sedentary, they may be able to pick up 20 pounds on occasion, otherwise would be limited to ten pounds or less if we were talking frequent lifting. Person should be able to sit up to six hours out of an eight hour work day, stand about one and walk about one with normal work breaks. And the ability to push and pull hand and foot controls is unlimited except the person has only occasional overhead reach. Person can climb stairs on occasionally [sic], would do so slowly and require a handrail. They are not qualified to work on ladders, scaffolds or ropes. They can balance, crouch, kneel, stoop or crawl only on occasion. The person from a standpoint of using their, their hands and grasping and gripping is limited to occasional use for grasping and gripping. They have no visual limits with proper corrective lenses, no communication limits. This person should avoid concentrated exposure to unprotected heights, fast, dangerous machines or high vibration, particularly the use of hand tools. The person is afflicted with pain from a variety of sources that may produce from mild up to marked degree of pain. However, with appropriate pain medications prescribed, the pain level should be limited to a moderate level of pain. Nonetheless, it would interfere with concentration such that the person would not be able to understand, remember and carryout [sic] detailed instructions

and would not be able to maintain concentration for an extended period of time. Taking into account those restrictions I stated up to this point, would such a person be able to do the past relevant work of the claimant?

(R. 75-76)

The VE responded the hypothetical individual "would be precluded from all the past relevant work due to the lifting restrictions and the gripping which would be more frequent." (R. 76) In addition, although the individual would have "some very minimal transferrable skills" from the daycare, such as caring for another's individual needs, the semi-skilled jobs in the area of personal care "would require more hand movement and hand manipulation" than the hypothetical individual could perform. (*Id.*)

However, considering those transferable skills, and further considering an individual of forty-six to forty-eight years of age "with a high school education, good ability to read, write, speak and understand English and to use basic math," the individual could perform some light, unskilled work such as usher, sales counter clerk, and furniture rental consultant. (R. 76-77) The individual also could perform sedentary work, including surveillance system monitor, charge account clerk, or credit authorization checker. (R. 77)

Upon further questioning by the ALJ, the VE agreed the ALJ's hypothetical individual would be suited "more towards the sedentary category than light"; however, the VE stated her testimony would not change if all of Hicok's testimony were found to be credible. (R. 78-79) Hicok's attorney then noted Hicok had testified she could only sit for ten minutes without having to adjust her position, and the VE opined the individual would be precluded from the sedentary jobs listed above "if adjustment would take more time and distracts them [from] doing the job." (R. 79-80) Similarly, if the individual could only work for a few hours a day, total, the individual would be precluded from working. (R. 80)

The VE was asked to consider the limitations set forth on a Functional Abilities Profile dated March 7, 2003, prepared by Steven Septer, M.D. of Mercy Medical Center's Work Center. (*See* R. 566-67) Hicok's attorney summarized the information on the profile as "limited to lifting 3.75 pounds at the most and limited to standing one or two minutes and limited to sitting five to ten minutes at a time with only occasional fine manipulation and no forceful gripping." (R. 80) Given those limitations, the VE opined the individual would be precluded from all of the jobs the VE identified earlier in her testimony. (*Id.*) In addition, if the individual had to elevate her feet to the same level as her heart, such as the elevation in a recliner, that would preclude competitive employment. (R. 81)

The VE noted that if the individual in the ALJ's hypothetical were unable to perform repetitive kneeling, crawling, or hand manipulation, the individual still would be able to perform the sedentary jobs the VE had listed. (R. 81-82) However, upon further questioning, the VE agreed that if medications made the individual fatigued and drowsy, that could impact the person's ability to work as a surveillance system monitor. (R. 82) Further, if the individual in the ALJ's hypothetical would miss work one or two days a week due to health problems, the VE opined that would preclude all competitive employment. (R. 83)

The VE stated that if a hypothetical individual had the limitations stated in the ALJ's hypothetical question, and in addition had the limitations and symptoms described by Hicok and Duane in their testimony, the individual would be precluded from competitive work. The VE based her response on the testimony that Hicok would be required to elevate her feet to a reclining position, and take frequent or extended rest breaks. (R. 87-88)

## 5.    The ALJ's decision

The ALJ found Hicok has not engaged in substantial gainful activity since January 2002 (R. 22), but Hicok had "a steady work history with above average earnings" until 2002. (R. 25)

He found Hicok to have severe impairments including "status post bilateral carpal tunnel releases, . . . fibromyalgia, mild osteoarthritis of the knees, mild diffuse degenerative joint disease of the right thumb, exostosis, a small bunion and mild narrowing of the metatarsophalangeal joint of the right foot, degenerative changes in the first metatarsophalangeal joint, a small bunion and a posterior calcaneus osteophyte in the left foot, right shoulder osteoarthritis of the glenohumeral and acromioclavicular joints with acromioclavicular osteophytes and mild lumbar spondylosis that was more prominent at the L1-2." (R. 28-29, ¶ 3) However, he found her impairments, singly or in combination, do not meet the regulatory requirements for disability. (R. 22, 29 ¶ 3)

The ALJ found Hicok's "testimony concerning her subjective complaints, functional restrictions, precipitating and aggravating factors and activities of daily living" was "not fully supported by the evidence of record." (R. 23) He found Hicok's allegations to be "inconsistent with clinical findings in the reports of medical professionals." (R. 25) He further discounted Hicok's claim that her medications make her tired, noting the record contains no evidence that Hicok's medications "were not efficacious when taken as prescribed or caused any adverse side effects." (R. 25-26) The ALJ found Hicok's "allegation of disability is inconsistent with her activities of daily living such as grocery shopping, dusting, cooking and babysitting her four year old grandson occasionally." (R. 26) He observed that no treating medical professional had indicated Hicok "would need to nap a lot during the day." (R. 26)

The ALJ disbelieved Hicok's complaints "of tenderness and pain in almost every joint of the body," noting that at a September 10, 2002, physical exam, she exhibited full ranges of motion in all joints and had no swelling, warmth, or deformity. He found her

medical diagnoses of "mild osteoarthritis of the knees, right thumb, exostosis, both feet and right shoulder osteoarthritis, as well as mild lumbar spondylosis," to be inconsistent with her subjective complaints regarding the severity, intensity, and duration of her alleged pain and tenderness. (*Id.*) He further noted a doctor had restricted Hicok to "lighter duty with the left hand, but there was a fair amount of work [she] could do at that time." (*Id.*) He further considered Dr. Trimble's note, in February 2003, that Hicok's "musculoskeletal discomfort was disproportionate to her relatively mild osteoarthritis." (*Id.*)

Im summary, the ALJ found that Hicok had "exaggerated her symptoms." (*Id.*) He noted that even after giving Hicok "great benefit of the doubt" in his hypothetical question, the VE testified Hicok would be able to work. (*Id.*)

The ALJ gave "little weight" to the opinions of Steven H. Septer, M.D., Richard B. Trimble, M.D., and an occupational therapist, all of whom opined Hicok is disabled and completely unable to do full-time work. The ALJ found those opinions were "conclusory and inconsistent with the signs and findings in the objective medical evidence of record, the results of laboratory and diagnostic tests, the opinion of Dr. Yankey and Dr. Crane and the failure to cite specific objective medical evidence upon which these opinions are based." (R. 26-27) The ALJ opined Drs. Septer and Trimble had accepted Hicok's subjective complaints as being credible in rendering their opinions.

The ALJ concluded Hicok cannot return to her past relevant work, but she is able to make the vocational adjustment to other work that exists in significant numbers in the local and national economies, and, therefore, she is not disabled. (R. 29)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant

retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226

F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796*; Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S.

1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).


## IV.  DISCUSSION

The court first notes that despite claiming a disability onset date of January 7, 2002, Hicok testified she became unable to work in August 2002, and in fact, she collected unemployment benefits until August 2002. Clearly, then, Hicok was not disabled prior to August 2002.

Hicok argues the ALJ erred in relying on the opinion of the consultative examiner, Dr. Yankey, and in rejecting the opinions of Hicok's treating physicians, Dr. Septer and Dr. Trimble. She asserts the ALJ failed to provide adequate reasons for rejecting the

treating physicians' opinions, and the ALJ's statement that those opinions were "conclusory" is not supported by the record. She argues substantial evidence, including the doctors' long-term treatment records, support their opinion that she is unable to work full-time. (*See* Doc. No. 8) In addition, Hicok argues the ALJ improperly ignored the findings of a two-week vocational evaluation, in which vocational counselors found Hicok was unable to work for more than two to two-and-a-half hours at a time due to pain, and her stamina prevented her from performing full-time work. (*Id.*)

The court notes the evaluation in question took place from December 4-18, 2003, at North Iowa Vocational Center. (R. 247-50) The evaluators noted Hicok learned new skills quickly, and was able to work independently in both simple and multiple-step tasks. She demonstrated good concentration, got along well with coworkers, and accepted supervision and correction well. Her primary limitation was her physical stamina. Hicok reported pain in her back, neck, hands, and all-over stiffness, even when she was able to alternate sitting and standing every fifteen minutes and stretch her legs and hands often. The evaluators recommended Hicok continue to build her stamina, and look for employment requiring no repetitive movements. They suggested possible employment options including "working at an information desk, customer service on the phone, or delivering mail someplace such as the hospital." (R. 250) Dr. Septer agreed with the vocational evaluation report. In a letter dated April 7, 2004, he noted, "I agree that the patient's functional ability is markedly limited, and her capacity to perform even limited activities is limited to no more than 2 to 2 1/2 hours at any one time." (R. 584)

Several months earlier, in February 2003, Dr. Trimble similarly opined Hicok was unable to "work eight hours a day at a job which requires regular significant physical labor," although he opined "she might well be able to work a shorter period of time in a job which allows her to move around, such as reception, clerical, or a sales job." (R. 458) The March 7, 2003, functional capacity evaluation also found Hicok could not perform the full range of sedentary work. (R. 559-67; *see* R. 566)

The ALJ summarily dismissed all of these findings and opinions on the basis that they were "conclusory and inconsistent with the signs and findings in the objective medical evidence of record, the results of laboratory and diagnostic tests, the opinion of Dr. Yankey and Dr. Crane and the failure to cite specific objective medical evidence upon which these opinions are based." (R. 27) The ALJ stated Drs. Septer and Trimble accepted Hicok's subjective complaints as credible "when the objective medical evidence does not support that assumption." (*Id.*)

The court notes Dr. Yankey examined Hicok on one occasion. He reviewed very limited medical records, citing only a right thumb x-ray from May 20, 2002, and three treatment notes. (R. 536) "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.' *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)." *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). In contrast, as the Eighth Circuit Court of Appeals held in *Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000):

> The opinion of a treating physician is accorded special deference under the social security regulations. The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Consistent with the regulations, we have stated that a treating physician's opinion is "normally entitled to great weight," *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999), but we have also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). Accordingly, we have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent

opinions that undermine the credibility of such opinions, *see Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p.

*Prosch*, 201 F.3d at 1012-13

In the present case, the court finds the evidence of record supports the opinions of Hicok's treating physicians that she is unable to perform full-time work. As early as October 2000, Hicok was exhibiting diffuse pain in her shoulders and neck that did not respond well to treatment. Dr. Crane's observation, at that time, that Hicok's subjective complaints of excessive pain did not align with his objective findings do not detract from Hicok's credibility given her ultimate diagnosis of fibromyalgia, a condition that is often misdiagnosed and which the Eighth Circuit has "long recognized" to be disabling. *Forehand v. Barnhart*, 364 F.3d 984, 987 (8th Cir. 2004). The medical evidence of record indicates Hicok was experiencing pain throughout her body by May 2002, and by August 2002, she had been diagnosed with fibromyalgia and her doctors opined she was unable to work full-time. The court further notes Dr. Crane's observations that Hicok's pain and response to stimuli appeared to be disproportionate to objective findings were made in late 2000 and early 2001, more than eighteen months before Hicok was diagnosed with fibromyalgia.

The ALJ further noted Hicok's daily activities, and the fact that she cared for her grandson on occasion, were inconsistent with her claim that she is disabled. (R. 26) As the *Forehand* court noted:

> [A claimant's] ability to engage in some life activities, however, does not support a finding that she retains the ability to work. *See Brosnahan [v. Barnhart]*, 336 F.3d [671], 677 [(8th Cir. 2003)] ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such

as cooking, cleaning, and hobbies, does not constitute
substantial evidence of the ability to engage in substantial
gainful activity."). We have long stated that to determine
whether a claimant has the residual functional capacity
necessary to be able to work we look to whether she has "the
ability to perform the requisite physical acts day in and day
out, in the sometimes competitive and stressful conditions in
which real people work in the real world." *McCoy v.
Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).
This test is consistent with relevant regulations on the issue,
*see* 20 C.F.R. § 404.1545, and we have reiterated it on a
number of occasions. . . . [Citations omitted.] Notwith-
standing this well-settled case law, out mandate is frequently
ignored, and appears to have been in this case.

*Forehand*, 364 F.3d at 988.

The court finds the ALJ failed to justify his failure to credit the opinions of Hicok's treating physicians, and the results of her extended vocational evaluation. When viewed as a whole, the record contains substantial evidence to support Hicok's claim that she is disabled, although the court further finds she has been disabled only since August 28, 2002, rather than since January 7, 2002. Therefore, the court finds the Commissioner's decision should be reversed.

## V. CONCLUSION

The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline*, 939 F.2d at 569 (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would

only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits). In this case, the court finds the ALJ's decision should be reversed, and this case should be remanded for calculation and award of benefits, with a disability onset date of August 28, 2002.

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, that unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, the Commissioner's decision be reversed, and this case be remanded for calculation and award of benefits.[4]

**IT IS SO ORDERED.**

**DATED** this 29th day of December, 2005.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

[4]NOTE: If the district court adopts this recommendation and final judgment is entered for the plaintiff, the plaintiff's counsel must comply with the requirements of Local Rule 54.2(b) in connection with any application for attorney fees.